```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF INDIANA
                          HAMMOND DIVISION


UNITED STATES OF AMERICA,      )
                               )
Plaintiff,                     )
                               )
vs.                            )         No. 2:15-CR-43
                               )
MOHAMED FADIGA,                )
                               )
Defendant.                     )
```

## OPINION AND ORDER

This matter is before the Court on the First Amended Motion to Suppress, filed by Defendant, Mohamed Fadiga, on June 5, 2014. (DE #23.) For the reasons set forth below, the motion is **DENIED**.

<u>BACKGROUND</u>

Defendant, Mohamed Fadiga ("Fadiga"), is charged with possession of counterfeit or unauthorized access devices in violation of 18 U.S.C. section 1029(a)(3). Fadiga has moved to suppress all evidence obtained on or about March 17, 2015. In his motion, Fadiga claims that the seizure was without lawful authority.

This Court held an evidentiary hearing on this matter on June 18, 2015, at which Kenneth Williams ("Officer Williams"), an officer with the Hobart, Indiana police department, testified.

At the conclusion of the hearing, the Court took the instant

motion under advisement and gave the parties five days from the receipt of the hearing transcript to file additional briefing. The parties filed their additional briefs on July 7, 2015. (DE #33 & DE #34.)

FINDINGS OF FACT

In making the following findings of fact, the Court has considered the briefs of the parties, the evidence presented, and the credibility of the witness. Therefore, the Court finds as follows:

On March 17, 2015,[1] Officer Williams was working in Jasper County, Indiana in his capacity as part of the Domestic Highway Enforcement Task Force ("Task Force"). The Task Force is loosely associated with the High Intensity Drug Trafficking Area ("HIDTA"). The purpose of the Task Force involves all crimes in general, including money laundering, narcotics, stolen vehicles, weapons offenses, fraud (including re-encoded cards), counterfeit merchandise, and stolen merchandise. As part of his training, Officer Williams attended several interdiction schools locally and throughout the country; this training included identifying fraudulent and re-encoded cards.

At approximately 3:42 PM on the date in question, as Officer

---

[1] The probable cause affidavit of Officer Williams mistakenly lists the date of the incident as March 27, 2015. (DE #25-2.) Officer Williams testified that this was a typographical error at the hearing. (DE #30, pp. 28, 30.)

Williams was traveling north on Interstate 65 ("I-65"), he observed a vehicle with an expired plate and initiated a traffic stop. Officer Williams informed the driver, Mamadu Barry ("Barry"), why he had pulled him over and asked to see his driver's license and vehicle information. Barry indicated that he did not know who the owner of the vehicle was but that the passenger, Fadiga, did. Officer Williams asked Barry if he would exit the car and have a seat in the front passenger seat of the police vehicle.

Once Barry complied, Officer Williams returned to the car to speak with Fadiga. Fadiga stated that he was going to Chicago to pick up a friend from the airport and that the vehicle belonged to a friend. Fadiga located a rental agreement. Neither Barry nor Fadiga were listed as authorized drivers of the vehicle pursuant to the rental agreement. Officer Williams asked Fadiga for his driver's license, and, as Fadiga was opening his wallet in his lap to retrieve his license, Officer Williams observed numerous cards in Fadiga's wallet, inside every slot including the pocket where cash is normally placed. The cards were "all over and literally falling out of the money pocket of his wallet." (DE #30, p. 37.)

At that point, Officer Williams took the rental agreement along with Fadiga's license and returned to the police car to conduct the traffic enforcement. While at the police car, Officer Williams questioned Barry regarding his travel plans. Barry indicated that he flew from Atlanta to Indianapolis to buy a car

but that it turned out to be broken so he did not purchase it. He was vague about the plans and indicated that Fadiga was the one who knew all of the details about the remainder of the trip. Barry was then issued a traffic warning for the expired plate. Officer Williams subsequently asked for and received permission from Barry to search the vehicle.

Upon returning to the vehicle, Officer Williams also received consent from Fadiga to search the vehicle, his person, and his wallet. Fadiga reached into his pocket and handed Officer Williams his wallet. Officer Williams again observed the numerous cards he had seen earlier. Officer Williams handed Fadiga his wallet back and asked Fadiga if he would have a seat in the back of the police car. Fadiga complied.

Officer Williams searched the vehicle and discovered a shopping bag full of gift cards behind the passenger seat. There appeared to be over 100 cards in the bag. He also located four garbage bags filled with cartons of Newport Cigarettes in the trunk. Both Barry and Fadiga denied that the items belonged to them.

Officer Williams then contacted Detective Sergeant Ogden of the Hobart Police Department to bring a magnetic strip reader to the location so that the status of the cards could be determined.[2]

---

[2] Officer Williams testified that he typically carries a card scanner in his usual police vehicle; however, on March 17, 2015, he was driving a different police vehicle that did not contain a scanner because his own vehicle was being retrofitted for his canine.

Once Detective Sergeant Ogden arrived on the scene approximately thirty-five minutes later, the cards from Fadiga's wallet were scanned, and it was determined that the magnetic codes on the back of the cards did not match the number on the front of many of the cards. As a result of the fraudulent cards, Fadiga was detained. Fadiga does not challenge these findings of fact.[3]

CONCLUSIONS OF LAW

The Fourth Amendment protects persons from unreasonable searches and seizures, and this protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); U.S. Const. Amend. IV. The Fourth Amendment prohibits a warrantless search, unless the search falls under one of the recognized exceptions to the warrant requirement. *U.S. v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). If a search is conducted without a warrant, the Government bears the burden of proving that an exception to the

---

[3] In his original motion to suppress (DE #21) and first amended motion to suppress (DE #23), Fadiga pointed out that there is a possible conflict (related to the timing of events) between the affidavits of Officer Williams and Robert J. Gallowitch, a special agent with the Department of Homeland Security Investigations ("Agent Gallowitch"). The Agent Gallowitch affidavit essentially summarizes Officer Williams' affidavit; however, the Gallowitch affidavit first states that Officer Williams issued the warning ticket to Barry and then states that Officer Williams observed the numerous cards in Fadiga's wallet. (See DE #25-1, p. 3.) This possible conflict was the reason the Court scheduled a hearing on the matter. Fadiga has abandoned this argument; he did not address it during the hearing or via his memorandum in support of his motion to suppress. In any event, as stated above, the Court finds that Officer Williams' testimony is credible; thus, his version of events is given full weight, especially in light of the fact that Agent Gallowitch was not present on the scene during the matter in question.

warrant requirement existed at the time of the search. *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001). Ultimately, the Fourth Amendment's touchstone is reasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

Here, Fadiga does not dispute that the original traffic stop, premised on the vehicle's expired license plates, was lawful. Rather, he argues that the stop was illegally extended the moment Officer Williams issued the traffic warning to Barry. The Government, on the other hand, argues that Officer Williams had reasonable suspicion to extend the traffic stop because of events that occurred prior to the issuance of the warning. The Court agrees with the Government.

The Supreme Court has made it clear that "[a] seizure justified *only* by a police-observed traffic violation . . . becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (emphasis added) (internal brackets and quotation marks deleted). The *Rodriguez* Court likened a traffic stop to a *Terry* stop, noting that the length of the stop depends on the seizure's mission, such as addressing the traffic violation and attending to related safety concerns. *Id*. at 1614-15 (listing appropriate inquiries like checking drivers' licenses, inspecting a vehicle's registration and proof of insurance, and determining whether warrants exist against

the occupants). The traffic stop becomes unlawful when unrelated inquiries measurably extend the length of the seizure. *Id*.

In *Rodriguez*, the defendant was pulled over for a minor traffic violation. *Id*. at 1612. The officer approached the vehicle, asked the defendant some questions, and requested to see his driver's license, proof of insurance, and registration. *Id*. at 1612-13. The officer ran a records check on the defendant (which came up clean), and then he asked the defendant and the passenger some questions as to what they were doing and where they were going. *Id*. at 1613. The men answered his questions, and the officer issued the defendant a written warning for the traffic violation. *Id*. However, the officer testified that the men were not free to leave at that point because he wanted to conduct a dog sniff of the vehicle but needed to wait for another officer to arrive on the scene. *Id*. Seven or eight minutes passed before the second officer arrived; once he did, the original officer walked his dog around the vehicle, and the dog alerted to the presence of drugs. *Id*.

The district court found that the dog sniff was not supported by independent reasonable suspicion, and the court of appeals did not review that determination. *Id*. at 1616. In fact, the district court specifically noted that, apart from the "information given by the dog," the officer had nothing but a "rather large hunch." *Id*. at 1613. In making its holding, the Supreme Court commented on

that distinction and stated that the issue remained open for the Eighth Circuit on remand. *Id*. at 1616-17.

As the Seventh Circuit has recently reiterated:

> [r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. This is an objective standard, based upon the facts available to the officers at the moment of the seizure. In determining whether officers had the requisite particularized suspicion for a *Terry* stop, we do not consider in isolation each variable of the equation that may add up to reasonable suspicion. Instead, we consider the sum of all of the information known to officers at the time of the stop. In other words, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect. Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters.

*United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (internal citations, quotation marks, and brackets omitted).

Here, the Court finds that there was reasonable suspicion, independent from the traffic violation, to extend the traffic stop. According to Officer Williams' probable cause affidavit and credible testimony, when he pulled the men over, Barry, who had an out of state license, was not able to identify to whom the car he was driving belonged; his only response to Officer Williams'

-8-

inquiry was that Fadiga knew.  When asked, Fadiga stated that the car belonged to a "friend," but when he procured a rental agreement, it indicated that neither he nor Barry were authorized to drive the vehicle.[4]  When Officer Williams asked Fadiga for his license, he observed numerous cards in Fadiga's wallet, inside every slot including the pocket where cash is normally placed, to the extent that the cards were "all over and literally falling out of the money pocket of his wallet."  Then, upon returning to the police vehicle where Barry was seated, Officer Williams asked Barry about his plans, but he was vague and indicated that Fadiga was the one who knew all of the travel details.  While it was at this point that Officer Williams chose to issue the traffic warning to Barry for the expired plate, he already had reasonable suspicion of criminal activity to extend the traffic stop.  The typical inquiries and requests involving the initial traffic violation had produced atypical responses and results from the men, including an obvious and unusual display of multiple cards from Fadiga.  Officer Williams utilized his training and experience in fraudulent investigations to determine that a possibility of fraud existed related to the cards that warranted further probing of the matter.

---

[4] Fadiga makes much of the fact that Officer Williams testified that he assumed he ran the vehicle's plates and hence knew both the name of the owner and that the car was not stolen before he pulled the men over for the traffic violation; however, the Court sees no reason why Officer Williams was unjustified in probing Barry and Fadiga for details, especially when it was apparent from the initial seconds of the traffic stop that questions existed as to whether they lawfully possessed the vehicle.

Fadiga insists that the extension was unjustified because a "fat wallet in and of itself does not indicate the commission of any crime." (DE #33, p. 5.) While the Court agrees with this statement, it was not the fat wallet alone that triggered Officer Williams' suspicions. Rather, it was a combination of the events described above that led Officer Williams to his determination that there was suspicion of card-related fraud. The Court finds, based on the totality of the circumstances, that this determination was reasonable. See *Ruiz*, 785 F.3d at 1141 ("Reasonable suspicion can arise from behavior that may in other circumstances be considered innocent; in other words, context matters.").[5] That said, the

---

[5] In his memorandum, Fadiga states, "counsel for Fadiga approached [Officer] Williams and pulled his license out of his wallet and then extracted 19 credit cards from the wallet. Williams was then asked, 'What is it about a fat wallet that suggests crime to you?" and he responded, 'Nothing.'" (DE #33, p. 2.) While the Court is not suggesting that Attorney Bosch, counsel for Fadiga, is being misleading, the Court feels that some clarification of the record is necessary. In actuality, Attorney Bosch approached Officer Williams at the witness stand, held his wallet over to the side, pulled his driver's license out of his wallet, shifted back towards the stand, and held the license up for Officer Williams' inspection. He then asked Officer Williams if there was anything suspicions about it (the license), to which Officer Williams replied, "No, sir." (DE #30, p. 31.) Attorney Bosch then asked Officer Williams whether he saw anything else suspicious, to which Officer Williams again responded, "No, sir." (*Id*. at 31-32.) Attorney Bosch walked several feet over to the Court's ELMO document projector, opened his wallet, extracted nineteen cards from it, and placed them on the projector. (*Id*. at 32-33.) After some back and forth with Attorney Houston, counsel for the Government, regarding the number of cards placed on the ELMO, Attorney Bosch stated, "And please let the record show all 19 of them were in my wallet, and Officer Williams said he didn't see anything suspicious about them." (*Id*. at 33.) Attorney Houston correctly noted that the question previously posed to Officer Williams was related to the license rather than the credit cards. (*Id*.) Only then did Attorney Bosch ask Officer Williams, "What is it about a fat wallet that suggests crime to you?" (*Id*. at 34.) Officer Williams responded, "Nothing." (*Id*.) Upon redirect, Officer Williams stated that he did not see Attorney Bosch's credit cards in his wallet when he was originally approached at the witness stand. (*Id*. at 35-36.) On re-cross and re-direct, Officer Williams clarified that while he saw Attorney Bosch take his license out of his wallet, he did not see the credit cards in the wallet when Attorney Bosch approached him. (*Id*. at 36-38.) Again, context matters.

Court does not find the Government's argument that the observation of numerous cards in Fadiga's wallet was akin to a "plain view" or "plain smell" case to be entirely persuasive. While it is true that the cards were in plain view, the cards in and of themselves were not obviously illegal or potentially dangerous in the same way that marijuana or a firearm respectively would have been. Instead, as described above, it was the *combination* of vague and uncertain answers given by the men, a lack of authorization to drive the vehicle as noted on the rental agreement, and the unusual display of cards in Fadiga's wallet that led to Officer Williams' reasonable suspicion that fraudulent activity was underfoot.

Finally, the Court notes that the extension of the traffic stop was limited in duration. Fadiga does not argue that the time from the initial stop to the writing of the traffic warning was unreasonable, and there is nothing in the record to suggest that Officer Williams performed his duties in an inefficient or overly delayed manner. Thus, the period in question is from the moment the written warning was issued to Barry until the moment Fadiga consented to the search. This period consisted only of Officer Williams asking Barry for consent to search the vehicle (which he voluntarily gave), walking back over to the vehicle, and gaining voluntary consent[6] from Fadiga to search the vehicle, his person,

---

[6] Fadiga does not challenge the voluntariness of the consent (which was given to Officer Williams verbally), and there is no indication in the record to suggest that it was in any way involuntary.

and his wallet.[7]  Again, Fadiga does not specifically argue that this particular period was too long; rather he focuses on the thirty-five minute delay between the actual search and the arrival of Detective Sergeant Odgen with the card scanner.  However, this argument misses the mark.  A thirty-five minute delay attributed to the arrival of the card-scanner was reasonable considering Fadiga had already consented to the search and Officer Williams had already discovered the cards in Fadiga's wallet, the bag of gift cards behind the seat, and the cartons of cigarettes.  See *Ruiz*, 784 F.3d at 1144 ("The appropriate focus is the time that elapsed between the initial stop and [the defendant]'s consent to search; consent renders a search reasonable under the Fourth Amendment unless given involuntarily.") (citation and ellipses omitted).

In sum, while the initial traffic stop was nominally extended following the issuance of the written warning until the time Fadiga gave his voluntary consent to search his person and the vehicle, the Court finds that the extension was supported by independent reasonable suspicion of criminal activity and was thus lawful.  Furthermore, the warrantless roadside search of the vehicle and subsequent scan of the cards was justified by Barry and Fadiga's

---

[7]  As noted in the facts section above, Officer Williams did not search the vehicle until he had gained consent from both men.  When he did search the vehicle, he found the shopping bag full of gift cards behind the passenger seat and four garbage bags filled with cartons of Newport Cigarettes in the trunk.  It was only then that Officer Williams contacted Detective Sergeant Odgen to bring the card scanner to the scene; it is clear that sufficient probable cause of fraud existed at that point to justify a delay associated with Detective Sergeant Odgen's arrival.

-12-

consent. Therefore, Fadiga's Fourth Amendment rights were not violated.

CONCLUSION

For the reasons set forth above, the First Amended Motion to Suppress, filed by Defendant, Mohamed Fadiga, on June 5, 2014 (DE #23), is **DENIED.**

**DATED: July 14, 2015**               /s/ RUDY LOZANO, Judge
                                       **United States District Court**